FILED
DEC 19 2014
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | 1:14MJ653 |
| | ) | |
| CARL KRUSE, JR. | ) | Hon. Ivan D. Davis |
| Defendant | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Patrick M. Boone, being duly sworn, affirm and state:

## INTRODUCTION

1. I am employed as a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately ten years. I am currently assigned to the FBI's Washington Field Office, Northern Virginia Resident Agency and to an economic crimes squad that investigates violations of federal law, including securities fraud, wire fraud, and money laundering, among other federal criminal statutes. I am involved in numerous corporate and economic crime investigations and have received training in investigating financial crimes.

2. I am assigned to this investigation, and my involvement has included reviewing financial and other records provided to me by numerous financial institutions and other entities.

3. This affidavit is submitted for the limited purpose of establishing probable cause. The facts in this affidavit are based on my investigation, personal observations, training, and experience, as well as information conveyed to me by other law enforcement officials. Because this affidavit is limited in purpose, I am not including all facts known to law enforcement concerning this investigation.

## PURPOSE OF AFFIDAVIT

4. This affidavit is submitted in support of the following:

   a. A criminal complaint charging CARL HERMAN KRUSE, JR. with: knowingly and intentionally having committed offenses against the United States, namely: Conspiracy to commit wire fraud and securities fraud, in violation of Title 18 United States Code Section 371, that is, to have knowingly combined, conspired, and agreed to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, and wire fraud, in violation of Title 18 United States Code Section 1343, by fraudulently manipulating the price and volume of WARRIOR GIRL CORP. stock and

   b. An arrest warrant for CARL HERMAN KRUSE, JR.

## RELEVANT INDIVIDUALS AND ENTITIES

5. CARL KRUSE, JR. ("KRUSE JR."), a citizen of the United States, held himself out as a controlling owner of WARRIOR GIRL CORP., and through a series of nominee brokerage accounts, controlled the majority of WARRIOR GIRL CORP. free trading shares along with CO-CONSPIRATOR 1 ("CC-1").

6. CC-1, a dual citizen of the United States and Germany, was an officer of WARRIOR GIRL CORP., and controlled the majority of the company's shares along with KRUSE JR.

7. FRY CANYON CORPORATION ("FRY CANYON") was a nominee entity that traded shares of WARRIOR GIRL CORP. and was controlled by KRUSE JR.

8. L.F. TECHNOLOGY GROUP, LLC ("L.F. TECHNOLOGY") was a nominee entity that traded shares of WARRIOR GIRL CORP. and was controlled by KRUSE JR.

9. STARBURST INNOVATIONS, LLC ("STARBURST") was a nominee entity that traded shares of WARRIOR GIRL CORP. and was controlled by KRUSE JR.

10. TACHION PROJECTS, INC. ("TACHION") was a nominee entity that traded shares of WARRIOR GIRL CORP. and was controlled by KRUSE JR.

11. WARRIOR GIRL CORP. ("WARRIOR GIRL") was an Over-the-Counter company publicly traded on the Pink Sheets under the ticker symbol "WRGL" and controlled by KRUSE JR. and CC-1. The Over-the-Counter ("OTC") securities market was the equity market for securities not listed on a United States stock exchange or the NASDAQ Stock Market. The OTC market was linked by computer networks, and quotations for OTC securities may have been quoted on listing services such as Pink Sheets. The Pink Sheets was an inter-dealer electronic quotation and trading system in the OTC securities market.

12. Nominee-1, a citizen of Denmark who resided in France, was listed as the account owner for accounts in the name of FRY CANYON, L.F. TECHNOLOGY, STARBURST, and TACHION, which were in fact controlled by KRUSE JR.

13. CO-CONSPIRATOR 2 ("CC-2"), a citizen of the United States who resided in Costa Rica, was a stock trader and customer service representative at Offshore Brokerage-1.

14. Offshore Brokerage-1 was an offshore brokerage located in Costa Rica that purported to specialize in trading microcap stocks through nominee accounts, and moving the proceeds of stock sales through various offshore accounts.

## SUMMARY

15. Beginning as early as 2009, KRUSE JR. and CC-1, with others known and unknown, conspired and agreed to engage in the market manipulation of WARRIOR GIRL stock (ticker symbol "WRGL"), otherwise known as a "pump-and-dump" scheme. A "pump-and-

dump" scheme involves the artificial manipulation of the price and trading volume of a particular stock in order to sell that stock at an artificially inflated price. As part of the pump-and-dump scheme, an individual or group of individuals obtains control over a substantial portion of the free trading shares of a company. Free trading shares are shares of stock that the owner can trade without restriction on a national exchange, e.g. the New York Stock Exchange, or are traded in an over-the-counter market. One such over-the-counter market is OTC Markets Group, formerly known as Pink Sheets LLC (the "Pink Sheets").

16. The "pump" involves artificially inflating a company's stock price by engaging in coordinated trading of the stock to create the appearance of a more active market for that stock – usually by controlling both the buying and selling activity of the stock. The pump also involves disseminating false and misleading promotional materials – press releases purportedly from the company or advertisements touting the prospects of a company's stock, to encourage innocent investors to purchase the stock.

17. After pumping up the stock price in the manner described above, the stock is "dumped," meaning large quantities of the shares owned and controlled are sold to unsuspecting investors. The dump usually occurs soon after the dissemination of the promotional materials touting the particular company. A pump-and-dump scheme also involves "parking" the shares by depositing or transferring them into different accounts, including accounts in the names of nominees, to conceal the manipulative trading of the stock. Nominee bank accounts are also often used to conceal the dissipation of the proceeds of the fraud.

18. A "nominee" is someone who owns an asset merely on paper, in order to disguise the true

owner of the property. Nominee owners are also used in connection with the formation of shell companies. Bank and brokerage accounts opened in the name of a shell company with a nominee owner are often referred to as "nominee accounts."

19. In order to effectuate the scheme in this matter, KRUSE JR. and CC-1 obtained a control position in the WRGL stock, which they concealed through a series of nominee brokerage and bank accounts. To realize profits from the sale of their securities, KRUSE JR. and CC-1 engaged the assistance of stock promoters as well as Brokerage-1 that offered to facilitate the sale of WRGL shares into the public market through its own nominee accounts. Through the dissemination of press releases in conjunction with coordinated trades, KRUSE JR. and CC-1. artificially inflated the price of WRGL stock. Under the guise of a legitimate market for WRGL shares, KRUSE JR. and CC-1 sold their shares to unsuspecting investors.

20. From 2009 through 2010, KRUSE JR. and CC-1's ongoing efforts to "pump and dump" WRGL stock resulted in approximately $3 million in illegal proceeds.

## STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

21. WARRIOR GIRL was incorporated in Nevada in 2002 under the name Legacy Home California, LLC and in 2004, changed its name to WARRIOR GIRL CORP. In its initial filing with the Pink Sheets, WARRIOR GIRL stated its business was to "manufacture and distribute women's [sic] and girl's [sic] clothing and apparel."

22. Thereafter, WARRIOR GIRL's stated business purpose underwent several iterations. In a 2005 filing with the Pink Sheets, the company asserted that "WRGL intends to be an investment company." In 2008, the company announced it was changing its corporate direction "to pursue technologies dedicated to helping achieve effective energy independence for the United States," and in 2009, WARRIOR GIRL filed an Acquisition Announcement with the Pink

Sheets in which it described its function as an oil extraction firm. In 2010, WARRIOR GIRL issued a series of press releases stating it was in the on-line education business and "focused on providing a quality education both online and in the classroom."

23. From 2004 through 2010, WARRIOR GIRL filed annual financial statements with the Pink Sheets. For each year through 2010, WARRIOR GIRL reported both its annual revenue and expenses as zero.

24. WARRIOR GIRL was controlled and operated by KRUSE JR. and CC-1. By KRUSE JR.'s own admissions in audio recordings from June 2010, he was a Director of the company and was "intimately familiar with Warrior Girl because [he'd] been running it for the last year." CC-1 was named in the company's public filings as the CEO, Director, and President and also signed public filings on the company's behalf.

25. KRUSE JR. and CC-1 held a controlling position in WRGL shares, as evidenced by their admissions in audio recordings from June 2010. On June 8, 2010, KRUSE JR. stated "we control almost 100% of the stock of the company," and in a telephone call on June 10, 2010, CC-1 stated he could provide up to sixty million shares for an upcoming promotion of WRGL stock. A review of transfer agent records indicates that on March 1, 2010, CC-1 issued to himself 124,994,780 shares of WRGL. As of June 2010, WRGL had 200,000,000 shares issued and outstanding.

26. As company insiders, KRUSE JR. and CC-1 were subject to restrictions on their trading of WRGL shares. Additionally, the fact that a relationship existed between them and that they maintained a controlling position in WRGL stock should have been disclosed in the company's public filings. Throughout 2009 and 2010, however, WARRIOR GIRL's public filings failed to disclose this information, repeatedly representing that "No relationships exist[ed]

among and between the issuer's officers, directors, shareholders, and beneficial owners owning more than 5% of the outstanding shares."

27. Rather, KRUSE JR. and CC-1 undertook deliberate efforts to conceal their ownership of the WRGL shares and circumvent the restrictions associated with the sale of their securities. In addition to personally held accounts, between 2003 and 2010, KRUSE JR. opened a series of brokerage accounts in the names of L.F. TECHNOLOGY GROUP, LLC ("L.F. TECHNOLOGY"), STARBURST INNOVATIONS, LLC ("STARBURST"), TACHION PROJECTS, INC. ("TACHION"), and FRY CANYON CORPORATION ("FRY CANYON") (collectively, the "KRUSE ACCOUNTS"). These accounts were opened at multiple brokerage firms and named Nominee-1 on the account opening paperwork as the primary signatory authority. The contact phone number provided for Nominee-1 was KRUSE JR.'s cell phone number, and the address provided for each company was a virtual mailbox located in the Bahamas. KRUSE JR. and CC-1 utilized the KRUSE ACCOUNTS to purchase, sell and transfer significant blocks of WRGL shares.

28. Between January and June 2009, trading in the KRUSE ACCOUNTS accounted for the majority of market activity in WRGL stock. In February 2009, there were several days in which the trading activity in the KRUSE ACCOUNTS amounted to nearly 100 percent of both the purchases and sales of WRGL stock. For example, on February 23, 2009, L.F. TECHNOLOGY sold 14,000 shares of WRGL and TACHION purchased 14,000 shares of WRGL. On that same day, TACHION sold 100 WRGL shares and STARBURST purchased 100 WRGL shares. Bloomberg listed the trading volume for the day as 14,200 shares. Similarly, on February 25, 2009, an account in the name of KRUSE JR. sold 20,000 WRGL shares and TACHION purchased 20,000 WRGL shares. STARBURST bought and sold 100 WRGL shares that same

day. Together, these transactions constituted 100 percent of the 20,100 share volume for that day as reported by Bloomberg.

29. A review of trading records indicates that between January and June 2009, the KRUSE ACCOUNTS were used to engage in a pattern of coordinated and pre-arranged trades to prevent drastic spikes in trading volume and price when the WRGL promotion began.

30. On or about June 12, 2009, a written promotional campaign began touting WRGL stock in the Eastern District of Virginia and elsewhere, which, in a later recorded conversation, KRUSE JR. admitted was orchestrated by him and CC-1. On June 12, 2009, HotOtc.com, an online penny stock newsletter, announced "WRGL how oil tar could change economy," and CoolPennyStocks.com disseminated information that "WRGL has announced the acquisition of two separate licenses for American Resource Petroleum Corporation's ('ARPC') oil sand and oil shale extraction processes plus a contract to recover oil on property controlled by ARPC in Utah, with proven recoverable oil reserves in excess of 125 million barrels!" On June 12, 2009 DrStockPick, another entity known to promote stocks, touted that "[i]t looks like WRGL will be a kind of 'King Midas' in the oil industry!"

31. The dissemination of the touting campaign, combined with trading amongst KRUSE-controlled accounts, created an appearance of trading volume and drew investors in. As a result, WRGL stock's trading volume and per share price increased significantly. On June 11, 2009, the trading volume was 65,700 with a share price of $0.2600 USD. On June 12, 2009, the trading volume spiked to 2,857,780, an increase of 4,250%, and the share price climbed to $0.4900 USD, an increase of 88%.

32. On June 12, 2009, the KRUSE ACCOUNTS sold approximately 1,043,500 shares of WRGL and received approximately $431,800 in proceeds.

33. From on or about June 12, 2009 until early July 2009, trading data shows that the KRUSE ACCOUNTS continued to trade WRGL shares, often buying and selling on the same day, which created an appearance of liquidity.

34. On July 6, 2009, WRGL's trading volume was 82,975 and its share price was $0.2600 USD. On July 8, 2009, following the market close WARRIOR GIRL issued a press release stating that its first commercial sized unit to extract oil from tar sands and oil shale was operational and being tested that week. Later that same evening, HotOtc.com announced that "WRGL Looks Ready to Break Out!" On July 9, 2009, WRGL's trading volume increased to 5,128,109 and its share price rose to $0.4500 USD.

35. In total, between July 7 and July 9, 2009, the KRUSE ACCOUNTS sold approximately 2,030,110 shares of WRGL, generating proceeds of approximately $1,015,400.

36. Between June and July 2009, the KRUSE ACCOUNTS made payments of at least $175,000 to known stock promoters to include $75,000 to Dualstar Media and $100,000 to Pudong LLC. A search and review of public records and prior regulatory filings revealed Dualstar Media as a promotion company that owns HotOTC.com and Pudong LLC as a promotion company that owns PennyPic.

37. Later, in a recorded conversation, on or around June 17, 2010, KRUSE JR. admitted his involvement with the WRGL promotions that occurred in June and July 2009 and stated that he paid several promoters in cash to pump the stock. According to KRUSE JR., the promoters "brought in about a million dollars worth of buying into the stock." KRUSE JR. further noted that "the promotion was, uh, actually it was a day and half really, not even two days . . . Everyone was paid in cash. Actually, everyone, it was two, two, two promoting groups and they

were paid in cash. Um, HotOTC was one promoting group, and PennyPic, spelled P-I-C, PennyPic was the other one."

38. Based on my review of financial records in this investigation for KRUSE ACCOUNTS, I know that on June 19, 2009, a payment of $50,000 was made from an E*Trade account in the name of STARBURST INNOVATIONS LLC to Pudong LLC via check number 1008. On July 9, 2009, a payment of $50,000 was made from an E*Trade account in the name of Nominee-1 to Pudong LLC via check number 1044. An E*Trade representative confirmed that these payments were processed through E*Trade's payment processing center, which was located in Arlington, Virginia, within the Eastern District of Virginia.

39. In or around February 2010, KRUSE JR. and CC-1 sought the services of Offshore Brokerage-1 to continue the fraud scheme involving WRGL stock. Beginning in February 2010, KRUSE JR. and CC-1 caused the transfer of at least 14.9 million shares of WRGL to accounts controlled by Offshore Brokerage-1. In addition, they enlisted the assistance of Offshore Brokerage-1 to engage additional co-conspirators to continue the scheme.

40. In April and May 2010, WARRIOR GIRL released several press releases that were disseminated nationally, including in the Eastern District of Virginia, and elsewhere, stating its plan to acquire Advanced Career Education Services ("ACES"), a purported online education provider, and touting its acquisition of ACES. The promotional campaign initiated through the services of Offshore Brokerage-1 was ultimately considered a failure as it generated neither significant trading volume nor increase in share price.

41. In June 2010, KRUSE JR. and CC-1 engaged in direct communication with CC-2. In recorded telephone calls with CC-2, both KRUSE JR. and CC-1 expressed dissatisfaction with the ongoing promotional efforts. On June 8, 2010, in a conversation with CC-2, KRUSE JR.

stated, "We really are not in the mood at all, after many years of experience, of sending out hundreds of thousands or millions of shares, just hoping and praying that [the promoters will] do something over the course of the months." KRUSE JR. further elaborated, "We put out press releases based on [the promoters'] representations, we bought our own stock in the market, about $15,000 worth, to move the stock up and fortify the bids and asks. We got zero, [CC-2], zero back from them." KRUSE JR. noted, however, that, "We are open for business with anyone who is serious minded and, uh, who can do something," and "that we'd be up for doing something with [the promoters] on a serious level." That same day, CC-2 spoke with CC-1, who was dissatisfied that the promoters had received shares of WRGL stock and did not perform. CC-2 presented the possibility of continuing the scheme through additional co-conspirators who were described as having the ability to "create outrageous volume." CC-1 advised CC-2 that he had forty million shares of WRGL available for transfer to Offshore Brokerage-1 and that they "ha[d] a good program, a good story," and asked to be put in touch with the promoters.

42. On June 8, 2010, KRUSE JR. and CC-2 spoke further about continuing the scheme to manipulate WRGL stock. KRUSE JR. stated that, "[WARRIOR GIRL's] a type of business that lends itself to lots of press releases and lots of news, and we can, we can turn on the, the press release machine and issue one a week, you know, and just keep everyone excited and up to date as to what's happening." KRUSE JR. also acknowledged that he and CC-1 had the ability to control the price of WRGL shares, stating, "We can start, probably much higher in terms of share price than it is now. I think we're at five cents or whatever on the offer, or four cents, I don't know what it is, but we can probably take it to eight, nine, ten cents and, and start from there." KRUSE JR. further explained, "[T]he stock really doesn't trade . . . but uh, we can put the stock almost anywhere we want."

43. The next day, on June 9, 2010, in response to CC-2's request to see copies of press releases for WRGL, KRUSE JR. responded, "I'll send you a few that we've already written, but keep in mind, we can, we can tailor this, [CC-2], to, uh, almost anything we need. But I'll send you some that, um, that, um, that we already have in the pot." Later in the same recording, CC-2 advised KRUSE JR. that Offshore Brokerage-1 was ready to start the WRGL promotional campaign and instructed KRUSE JR. that the promoters would probably need six to eight press releases that could be released on an ongoing basis over one or two weeks' time. KRUSE JR. responded, "It looks like I have three press releases here. We can come up with, you know, another ten, just to keep the pot, you know, the boiling kind of thing. We need to write them, it will probably take us, I don't know, a few days to do that, uh, but they're very doable."

44. On June 15, 2010, CC-2 and KRUSE JR. discussed various aspects of the planned promotional campaign for WRGL stock and how the shares would be sold. CC-2 informed KRUSE JR. that the promoters planned on creating between fifty and sixty million shares in volume in a short amount of time. CC-2 and KRUSE JR. agreed to coordinate the selling of WRGL shares between Offshore Brokerage-1 and various KRUSE ACCOUNTS. CC-2 explained that Offshore Brokerage-1 would sell a block of WRGL shares and that they let "[KRUSE JR. and CC-1] know when, obviously, the buying's going to come in so [KRUSE JR. and CC-1] could sell all [their] shares from wherever [they] have the rest of them placed." CC-2 also instructed KRUSE JR. on how to transfer additional shares of WRGL to Offshore Brokerage-1 in advance of the planned stock promotion. KRUSE JR. agreed to send additional shares to one of Offshore Brokerage-1's nominee accounts.

45. On June 21, 2010, CC-2 and KRUSE JR. spoke again. CC-2 confirmed Offshore

Brokerage-1 had received the WRGL stock, and that it was expected that the promoters wanted "to get going soon." KRUSE JR. noted that "We closed the stock at, uh, .075 today. . . Just so you can see that we, uh, can move the stock kind of at wi—well, within a certain range. But, uh, we can probably, well, again, no guarantee, but my guess is we can have it at .08, .09, maybe .10 with very little difficulty, maybe even more, maybe .11, .12, .13 . . . ." KRUSE JR. continued, "If we wanted to start lower, you know like, you know, .05, .06, .07, I think it would be smooth sailing up to .11 or .12 is my guess." CC-2 advised KRUSE JR. that the goal was to get the price around .07 or .08, with anticipated average sales at .10 once the promotion was underway. CC-2 said there would be an update the following day. KRUSE JR. responded, "Alright, let's do it."

46. On June 29, 2010, CC-2 informed KRUSE JR. that the promoters asked to send them copies of press releases for WRGL and that it was thought that the campaign might begin within two days' time. CC-2 thought the plan was for the first press release to be issued after the markets closed on July 1, 2010, but would be in touch.

47. Later in the evening on June 29, 2010, CC-2 spoke with both KRUSE JR. and CC-1 and relayed a message that the promoters wanted to see projected revenues in the press releases that would be disseminated. KRUSE JR. stated he could get CC-2 such a press release for issuance after the markets closed on July 1, 2010. KRUSE JR. suggested issuing "some of the fluffier press releases just to keep, you know, the drums beating type of thing. So we could have, like, um, one numbers type press release, then another fluff one, then numbers, and then another, you know 'hey, look at this,' and then maybe another numbers, you know what I'm saying . . . ." KRUSE JR. assured CC-2 that "we're ready to go whenever you are, and we can move very quickly on the press releases with numbers. We have a very good writing team."

48. During that same conversation, KRUSE JR. and CC-2 also discussed the amount the

promoters would be compensated out of proceeds made from the sale of WRGL shares. To avoid any misunderstanding, CC-2 emphasized that "we all have to be in communication, make sure we're working together, and everyone's selling their shares out accordingly and not hurting the market." KRUSE JR. responded, "We will work however you and everyone else wants to coordinate it. Like I said, we want this to work, too. . . . As long as we have an understanding that, hey listen, whatever volume comes in, 3:1, 4:1, 2—, whatever it is, whatever it is, that's fine, and we will, we will honor, um, you know, whatever the, you know, the deal is."

49. On July 1, 2010, KRUSE JR. confirmed that CC-2 had received a copy of the new press release that was to be disseminated later that day. CC-2 told KRUSE JR. that it looked good and asked that he proofread it several more times and put it out for release after the market closed at 4:01pm EST. KRUSE JR. agreed, stating "4:01 Eastern Time, the press release will go out via, uh, PR Newswire. You will see it on the Warrior Girl, um, ticker symbol."

50. At 4:03pm on July 1, 2010, WARRIOR GIRL issued a press release forecasting revenue projections from its acquisition of Advanced Career Education Systems Inc. ("ACES") over the following five years. The announcement set forth the company's belief "that revenues within the first year of operation should approximate $2,695,202 from our initial virtual high school with approximately 2,225 students, as well as an additional 2,025 students from our advanced high school and vocational school." The press release projected second year revenues as "$8,959,055 from continued growth from year one launches, another Vocational Education School launch with 390 students, Pedigree High School Launch with 135 students, and another acquisition with 220 students." Third year revenues were anticipated to be "$27,267,396 with gross earnings in excess of $9,088,937 from continued growth in previous brands and the acquisition of two more schools" with varying numbers of students. The press release went on to make the statement,

"Revenues at any phase could be accelerated even faster with an injection of further capital, but in any case, once new programs are launched revenue will be generated quickly and result in exponential growth." The company stated that "By year five we plan to be at 81,415 students and at $245,801,395 ($3,019/student) in revenues and $75,030,488 in gross earnings, and have completed two major acquisitions, one in the university space."

51. An interview conducted with the CEO of ACES, revealed that as of July 1, 2010, ACES had not yet been incorporated and that it was not filed as a company until July 29, 2010.

52. Based on my review of the trading records, KRUSE JR. and the KRUSE ACCOUNTS generated proceeds from the sale of WRGL stock of approximately $1,793,543 in 2009, and $296,025 in 2010, totaling over $2,000,000.

53. Based on my investigation and further review, I know that between 2011 and 2013, KRUSE JR. and CC-1 continued the activity alleged above regarding the manipulation of the WRGL stock. Between 2011 and 2013, KRUSE JR. generated additional proceeds of approximately $814,789. In total, between 2009 and 2013, KRUSE JR. generated approximately $3 million in proceeds from the sale of WRGL shares.

**RECENT DEVELOPMENTS**

54. On September 24, 2014, KRUSE JR. was interviewed by two FBI Agents at his home, located at 1840 Chucunantah Road, Miami, Florida. KRUSE JR. was informed of a criminal investigation being conducted by the U.S. Department of Justice (DOJ). Following the interview, KRUSE JR. told the FBI Agents he wanted to cooperate with law enforcement. On the following day, September 25, 2014, the interviewing Agent received an email from an attorney who communicated he was going to represent KRUSE JR. in the matter being

investigated by DOJ. Thereafter, KRUSE JR., through his attorney, made continual representations that he intended to cooperate with law enforcement.

55. Meanwhile, on October 3, 2014, KRUSE JR. entered into a sales contract to sell two properties that he owned outright, located at 1840 Chucunantah Road and 2800 Chucunantah Road, Miami, Florida. According to Miami-Dade County land records, KRUSE JR. purchased both properties on October 22, 2004, securing a note for the principal of $630,000 from Home Federal Bank of Hollywood. Both properties were subject to a monthly mortgage.

56. As described previously in this Affidavit, KRUSE JR. controlled two brokerage accounts at E*Trade in the names of L.F. TECHNOLOGY GROUP LLC (ending in 6873) and STARBURST INNOVATIONS (ending in 0219). Both accounts were opened by KRUSE JR. with Nominee-1 held out as the purported account holder.

57. Between January 1, 2009, and July 31, 2009, E*Trade accounts 6873 and 0219 maintained stock portfolios, and, on average, WRGL shares comprised over 99% of the total market value held in each of the two accounts. During that same time period, the two accounts generated a total of $563,827 in proceeds from selling WRGL shares. Account 6873 made four payments to Home Federal Bank of Hollywood totaling $68,053.46. Three payments were in the amount of $6,017.82 and were made on January 12, April 12, and May 12, 2009, respectively. The fourth payment was in the amount of $50,000 and was made on July 10, 2009. Similarly, account 0219 made five payments to Home Federal Bank of Hollywood totaling $458,435.31. Three payments were in the amount of $6,017.82 and were made on February 6, June 12, and June 23, 2009. The fourth payment was in the amount of $100,000 and was made on July 10, 2009. The fifth payment was in the amount of $340,381.85 and was made on July 14, 2009. On August 11, 2009, a satisfaction of mortgage was recorded, wherein the Home Federal Bank of

Hollywood acknowledged full payment and satisfaction of the note and mortgage deed held in the name of KRUSE JR. for the two properties at 1840 Chucunantah Road and and 2800 Chucunantah Road, Miami, Florida.

58. On October 15, 2014, I reviewed travel records obtained through the Treasury Enforcement Communications System ("TECS"), which reflected that on that same day, KRUSE JR. traveled from Miami, Florida to London Heathrow Airport with no reservation to return to the United States.

59. On October 27, 2014, the sale of KRUSE JR.'s two properties was finalized. The next day, and at KRUSE JR.'s instruction, the proceeds from the sale were wired into an account in London, United Kingdom. The amount of the proceeds was $1,385,914.98, and the account into which they were deposited was for the benefit of KRUSE JR.

60. I have obtained and reviewed records relating to the Mercedes Benz CL500 Coupe automobile with tag number 832XLJ owned by KRUSE JR. KRUSE JR. most recently registered this vehicle on January 15, 2014 with an expiration date of August 20, 2015. The records reflect that on October 25, 2014, the car was transferred from KRUSE JR. to an individual by the name of Walter Torres, who I know to be the occupant of 2800 Chucunantah Road, one of the two properties sold by KRUSE JR on October 27, 2014.

## <u>CONCLUSIONS OF AFFIANT</u>

61. Based on my training and experience, and the information provided in this affidavit, there is probable cause to believe that from in or around 2009 to in or about 2013, within the Eastern District of Virginia and elsewhere, CARL HERMAN KRUSE, JR. caused proceeds to be generated from a scheme to defraud individuals of money and property and in so doing,

committed conspiracy to commit wire fraud and securities fraud in violation of Title 18, United States Code § 371.

62. Wherefore, pursuant to Rule 4 of the Federal Rules of Criminal Procedure, I respectfully request a warrant to arrest CARL HERMAN KRUSE, JR.

S.A. Patrick Boone
Federal Bureau of Investigation

Sworn and subscribed to before me this 19th day of December, 2014.

/s/
Ivan D. Davis
United States Magistrate Judge